**F I L E D**

**UNITED STATES COURT OF APPEALS**

**February 27, 2007**

**TENTH CIRCUIT**

SHEILA OFFICER,

      Plaintiff-Appellant,

v.

SEDGWICK COUNTY, KANSAS;
and SEDGWICK COUNTY
DEPARTMENT OF CORRECTIONS,

      Defendants-Appellees.

No. 05-3404
(D.C. No. 04-CV-2418-KHV)
(D. Kansas)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **EBEL**, and **GORSUCH**, Circuit Judges.

Sheila Officer seeks damages from her former employer, Sedgwick County,

Kansas (the "County"), for its termination of her employment allegedly in

violation of Title VII. The district court granted summary judgment in favor of

the County after finding that Ms. Officer failed to identify a material factual

dispute suggesting that she suffered an adverse employment action as a result of

---

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

her race.  Our review confirms that, on the limited factual record developed solely

by the County, entry of summary judgment was appropriate.[1]

I

A

From October 1991 through August 30, 2002, Ms. Officer, an African-

American, was employed by the County as an Intensive Supervision Officer ("ISO

I") in the County's Department of Corrections community corrections program

(the "Corrections Department").  As an ISO I in the adult corrections services

department, Ms. Officer was tasked with monitoring adult felons on probation and

ensuring that they complied with court-ordered conditions of probation.  *See*

Aple. App. at 168; *see also id.* at 130, 141.  Her job responsibilities included

gathering and verifying client intake information; developing a supervision plan;

creating and maintaining files tracking client compliance and progress; and

generally liaising between the client, courts and law enforcement.  *Id*. at 168-69.

Beginning in approximately 1998, Ms. Officer's job performance audits

(including formal and informal evaluations), while positive in many respects,

critiqued her repeated failures to report and take seriously her probationers'

---

[1]  Cited below are only those facts essential to the resolution of the matters appealed to us.  For a more detailed chronology of the events giving rise to this litigation, see the district court's comprehensive memorandum and order granting summary judgment to the County.  Aple. App. at 600-634.

deviations from probation conditions.[2]  Although Ms. Officer received repeated warnings, she apparently did not alter her behavior and people outside the Corrections Department began to take note.  On July 22, 2002, Judge David Kennedy, a Sedgwick County district judge, contacted Ms. Officer's superior, Annie Nash, to express his concern that Ms. Officer was "running interference," or protecting her probationers from him.  Ms. Nash directed Greg Friedman, an ISO II, to speak with Judge Kennedy regarding this issue; during this meeting, Mr. Friedman noted Judge Kennedy's statement that he "does not send his defendants to Sedgwick County Department of Corrections to be 'loved' and that if Sheila was going to love them instead of supervise them he did not want her to supervise his defendants."  *Id.* at 290.  At the conclusion of this meeting, Judge Kennedy requested the Corrections Department to review Ms. Officer's case files involving a host of probationers subject to her supervision.  *See id*. at 288-90.

---

[2] *See* Aple. App. at 228 (November 30, 1998 Interim Review) ("In her zealous efforts to assist her clients, she frequently fails to integrate [the] program's policies and procedures into her decision making."); *id.* at 245 (October 29, 1999 Performance Review) ("In her desire to help her clients, she sometimes loses focus of the bigger picture.  She has difficulty detaching from her clients . . . ."); *id.* at 263 (November 2001 Interim Review) ("Sheila sometimes makes recommendations to the court which do not reflect the seriousness of the client's violations."); *id.* at 268 (Memo from Supervisor Annie Nash dated March 12, 2002 regarding Ms. Officer's job performance) ("You are to fully disclose client violations to the judge.  File audits have shown occasions in which only partial disclosure has occurred.").

Ms. Officer's job performance evaluations from as early as March 1999 also revealed chronic problems complying with department policy to maintain client files accurately and consistently.[3]  On February 22, 2000, Ms. Officer received a "memorandum of concern" from Ms. Nash regarding Ms. Officer's "ongoing difficulty . . . in maintaining [her] clients [sic] files according to . . . program[] policies and procedures."  *Id*. at 252.  Her May 2000 evaluation showed no sign of improvement in this regard:  it observed that Ms. Officer "is willing to follow policies that are in agreement with her values and opinion" and that she consistently failed to provide adequate documentation of client communications and progress.  *Id*. at 258.

B

Ms. Officer's job troubles came to a head in a case involving Ronda Felix, a probationer convicted of multiple counts of theft and fraud.  Ms. Felix was charged to Ms. Officer's care upon her sentencing in February of 2001.  Aple.

---

[3]  *See* Aple. App. at 233 (Memorandum from Ms. Nash to Ms. Officer dated March 11, 1999) (two client files were missing probation violation letters in their files and Ms. Officer was ordered to file all such documents in the future); *id*. at 250 (Memorandum from Ms. Nash to Ms. Officer dated Jan. 27, 2000) (Ms. Nash documented deficiencies in Ms. Officer's client files and observed that "some offenders [of] especially high risk requires [sic] a more strict adherence to policies . . . [an audit of Ms. Officer's files] revealed that [a sex offender whom Ms. Officer was supervising] is not being supervised . . . according to program' [sic] guidelines and . . . contact standards.  High risk offenders **must** be supervised according to programs's guidelines . . . Few clients have the correct employment information and you are not entering the intervention information . . ." (emphasis in original)).

App. at 306. Ms. Felix was temporarily also under the watch of Cinda Hahn, a Shawnee County caseworker, from March 20, to November 14, 2001. Ms. Felix was thereafter transferred back to Ms. Officer's sole care. *Id.* at 309.

On March 15, 2001, Ms. Officer received a phone call from Ms. Felix's roommate, LaJune Carson, claiming that Ms. Felix had stolen some of her clothing and forged her checks. *Id.* at 160. Ms. Officer took no action in response to this allegation; she did not obtain the police report Ms. Carson had filed, or inquire further; nor did she supply any plausible reason for inaction. *Id.* at 160. Ms. Officer similarly dismissed allegations by a furniture rental company on March 22, 2001, that Ms. Felix had left town with its property. *Id.* at 160. Ms. Officer claims no action was necessary because "[Ms. Officer] put Ronda Felix on a bus personally. She could not have left with their property." *Id.* at 160.

On June 19, 2001, Ms. Officer received a call from Ms. Hahn, the Shawnee County ISO, notifying her that Ms. Felix's employer claimed that she forged checks from his business account. *Id.* at 160-61. Ms. Officer admits she did not conduct any follow up on this allegation either; in her view, "should an investigation occur, it would have been the responsibility of the ISO in Topeka[, Ms. Hahn]." *Id.* at 161. Ms. Officer subsequently received more phone calls from Ms. Hahn, this time in October and November of 2001, regarding Ms. Felix's recurring violations of her probation conditions. In response to these

complaints, Ms. Hahn submitted to Ms. Officer an affidavit identifying Ms. Felix's violations of her probation and Ms. Officer, in response, filed a warrant for Ms. Felix's arrest; Ms. Felix was subsequently brought back to Sedgwick County on this warrant. *Id.* at 161.

At a court hearing in February of 2002 in Sedgwick County, Ms. Felix's probation was reinstated subject to certain modifications – namely, Ms. Felix was, among other things, to obey all laws, obey all of Ms. Officer's instructions, maintain full-time employment except during inpatient treatment and while enrolled in school on a full-time basis, and reside and work in Sedgwick County. *See id.* at 313, 306-07. At this hearing, Ms. Officer observed that Ms. Felix appeared to be pregnant. *Id.* at 149.

On April 4, 2002, Ms. Officer sent Judge Karl Friedel, the Sedgwick County district judge who ordered Ms. Felix's probation, an email representing that Ms. Felix was pregnant but that she was employed and was complying with the terms of her probation. *Id.* at 323. On June 21, 2002, Ms. Officer sent Judge Friedel another email, this time representing that Ms. Felix was "two days short of having her baby" and that she gave Ms. Felix a "three week grace period providing she delivers within the next few days" within which to complete her community service work. *Id.* at 325. On Friday afternoon, July 5, 2002, Ms. Felix contacted Ms. Officer and told her that someone had stolen her baby at the hospital shortly after giving birth. *Id.* at 157-58. Although Ms. Officer does not

recall being directed to contact the hospital to verify Ms. Felix's delivery of a baby and the police to see if anyone reported an abduction, Ms. Officer does not controvert the accuracy of electronic records showing that she contacted the hospital on July 5, 2002, to see if it had a record of Ms. Felix giving birth, which it did not, and the police department to see if it received a report of an abducted baby, which it had not. *Id.* at 348. Thus, Ms. Officer's own contemporaneous records suggest she was aware both that Ms. Felix had not given birth and that she had reported no abduction.

Over that weekend, a Wichita newspaper reported a "suspicious woman" dressed in hospital scrubs and a lab coat who was visiting hospitals in the area and probing staff as to where newborns were kept. *Id.* at 148. Ms. Officer brought the article to Ms. Nash's attention the following Monday morning. *Id.* Ms. Nash suspected that Ms. Felix was the "suspicious woman" and instructed Ms. Officer to contact Ms. Felix's physician for information on when and where the baby was delivered. *Id.* at 150. Ms. Felix's physician, Dr. Debra Messamore, told Ms. Officer that Ms. Felix had a prior hysterectomy and thus could not possibly have been pregnant. *Id.* at 151.

On July 10, 2002, Ms. Nash conducted an audit of Ms. Officer's case file on Ronda Felix. *Id.* at 369-74. She found numerous errors primarily stemming from Ms. Officer's failure to follow department policy regarding proper documentation of client files. She also noted Ms. Officer's failure to take

seriously allegations of Ms. Felix's probation violations and questioned Ms. Officer's judgment in "so willingly believ[ing] the client but . . . [having] difficulty believing administration." *Id.* at 225. Ms. Felix was subsequently arrested and pled guilty to impersonating a doctor. Appellant's Br. 18.

C

On July 19, 2002, Kerri Platt, Ms. Nash's supervisor, met with Ms. Officer in Ms. Nash's presence and queried Ms. Officer's handling of Ms. Felix's case; specifically, she focused her concern on why Ms. Officer did not seek confirmation of Ms. Felix's pregnancy when Ms. Felix sought to miss work (and thus violate a condition of her probation) due to this medical condition. Appellant's Br. 22. Ms. Officer's response was that she did not think it necessary because at the court hearing in February 2002, Ms. Officer alleges that Judge Friedel "acknowledged [Ms. Felix's] pregnancy in the courtroom" and stated that Ms. Felix would not need to work for a limited time before and after the delivery. Aple. App. at 163.

On August 13, 2002, Ms. Platt issued a pre-termination memorandum to Ms. Officer. This memorandum, prepared by Ms. Platt for Mark Masterson, the Corrections Department Director (the "Platt Memorandum"), sought to justify Ms. Officer's termination primarily on the basis of Ms. Officer's handling of Ms. Felix's case, though it also cited overall inadequate work performance. *See* Aple. App. 379-84. Ms. Officer was invited to respond to this memorandum at a pre-

termination hearing before Mr. Masterson. *Id.* at 379. On August 29, 2002, Ms. Officer and her attorney attended the hearing and presented evidence and arguments urging Mr. Masterson not to terminate her. Appellant's Br. 36-37. The next day, Mr. Masterson issued a Notice of Termination to Ms. Officer which listed seven specific findings seeking to justify Ms. Officer's termination (the "Masterson Memorandum"). Among other things, Mr. Masterson found that: (1) Ms. Officer failed to correct inadequate work performance after being advised of specific areas of needed improvement; (2) her violations of department policy in Ms. Felix's case were not unique "but represented a pattern of deficiencies in job performance detailed in the personnel file"; (3) her "failure to act in verifying information on several reports of possible new criminal activity consistent with Rhonda Felix's history not only harmed the client but jeopardized public safety"; and (4) each of the violations contained in the Platt Memorandum was supported by the evidence. Aple. App. at 390-91.

Following her termination, Ms. Officer brought this action claiming that she was fired because of her race and in retaliation for expressing concern five years earlier that the County had a disproportionately small number of African-American ISOs in light of the significant number of African-American probationers. After the County moved for summary judgment on both claims, the district court issued a memorandum and order granting the County's motion. The district court held that the discriminatory discharge claim must be dismissed

because Ms. Officer failed to show that the County's race-neutral reasons for her discharge were pretextual, and that her retaliatory discharge claim also failed because she did not establish a prima facie case. *See id*. at 625-34.

## II

We review the district court's grant of summary judgment *de novo*. *Young v. Dillon Co.*, 468 F.3d 1243, 1249 (10th Cir. 2006). Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In adjudicating such a motion, we are obliged to view the record evidence in the light most favorable to the nonmovant and draw all reasonable inferences therefrom in favor of the nonmovant. *Young*, 468 F.3d at 1249.[4] Notwithstanding the foregoing, the

---

[4] Because the record on appeal filed by Ms. Officer contains evidence not presented to the district court in its adjudication of the summary judgment motion, and Ms. Officer did not file a motion to supplement the district court's record with this material, we will not consider it. We are bound to consider only those materials before the district court or otherwise properly a part of the record on appeal. *See* Fed. R. App. P. 10(a) (the record on appeal consists of the papers and exhibits filed in the district court; transcript of proceedings, if any; and a certified copy of the docket entries prepared by the district court); *see also APG, Inc. v. MCI Telecomm. Corp.*, 436 F.3d 294, 297 n.1 (1st Cir. 2006) (appellate court review of "summary judgment rulings is limited to the record as it stood at the time of the district court's decision"). Accordingly, all cites to the record are to the record prepared by the Appellees which is compliant with Rule 10(a) of the Federal Rules of Appellate Procedure.

nonmovant cannot rely on "ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

Title VII provides a cause of action to employees who suffer an adverse employment action because of their race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e-2(a)(1). Because Ms. Officer seeks to prove her Title VII claims solely through indirect or circumstantial evidence of racial animus, we examine her claim under the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case of discrimination. *See Young*, 468 F.3d at 1249. Upon the plaintiff's establishment of a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id*. If the employer is able to do so, the burden reverts back to the plaintiff to show that the justification offered by the employer was simply pretext: an attempt to obscure racial discrimination. *Id*.

A

The parties agree that the plaintiff met her initial burden of proving a prima facie case with respect to her discharge and that the defendants articulated non-discriminatory reasons for her termination; thus, the viability of Ms. Officer's claim of illegal discharge is dependent upon resolution of the third step of

*McDonnell Douglas*. *See* Appellant's Br. 50; Appellees's Br. 49-50. We have previously noted that a plaintiff may prove that a defendant's stated reasons are pretextual in a variety of ways; a plaintiff is not "forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 187-88 (1989) (alterations omitted)).[5] Here, plaintiff alleges that there are four distinct reasons evidencing that the defendants' reasons for terminating her were pretextual: (1) only four of the Corrections Department violations contained in the Platt Memorandum had merit (leaving eight meritless violations); (2) those four violations were not significant enough to "warrant immediate termination rather than the progressive disciplines of reprimand, probation, or demotion which is County disciplinary policy"; (3) Ms. Platt's and Mr. Masterson's racial animus can be inferred through the racial composition of the employees recommended for termination and terminated, respectively; and (4) Ms. Officer received disparate treatment from a similarly situated Caucasian employee. Appellant's Br. 50-52.

---

[5] Although the plaintiff's claims in *Kendrick* were brought under 42 U.S.C. § 1981 and not under Title VII, the elements of a plaintiff's case are the same and the analytical framework established by *McDonnell Douglas* controls; thus, we are bound, in this Title VII context, by our 42 U.S.C. §§ 1981 and 1983 cases on point. *See Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004).

*1.    Falsity of Violations.*    The Supreme Court has observed that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).  However, such a showing will not "*always* be adequate" and "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id.*  Our precedent further instructs that, in order for a plaintiff to show pretext, he or she must demonstrate

> such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.  Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment.

*Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (quotation omitted).  We have further clarified that "the relevant falsity inquiry is whether the employer's stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue . . . [and that t]he reason for this rule is plain: our role is to prevent intentional discriminatory hiring practices, not to act as a super personnel department, second guessing employers' honestly held (even if

erroneous) business judgments." *Young*, 468 F.3d at 1250 (quotations and citations omitted).

Ms. Officer claims that pretext can be established in this case because many of the policy violations identified in the Platt Memorandum "are just false." *See* Appellant's Br. 50, 58. Of course, Ms. Officer was fired not by Ms. Platt; neither was the Platt Memorandum the operative document discharging her; rather, Mr. Masterson discharged her and the reasons for her termination were those listed in the Masterson Memorandum. Aple. App. 390-91. However, because Mr. Masterson found that the policy and procedure violations contained in the Platt Memorandum were "supported by the evidence and found to be true," if the violations were indeed false, and if Ms. Officer were successful in proving that the remaining reasons identified by Mr. Masterson for her discharge were also false, we assume for purposes of our analysis that a factfinder could determine that the discharge was discriminatory.

Ms. Officer, however, effectively admits to five of the twelve policy violations identified in the Platt Memorandum – two are failures to maintain records,[6] two are failures to investigate allegations of non-compliance with

---

[6] Although Ms. Officer does not expressly admit that she committed the second policy violation identified in the Platt Memorandum, *see* Appellant's Br. 58, in her brief she states in regards to this violation that "she did her job, but did not write it down. Officer agrees that not recording is a violation, but not sufficient to justify termination." *Id.* at 24. Because the policy at issue was a

(continued...)

- 14 -

probation conditions, and the last is a failure to assess accurately Ms. Felix's risk which resulted in her being supervised at a level less intensive than it should have been. *See* Appellant's Br. 58.

Even viewing all the evidence in the light most favorable to Ms. Officer and drawing reasonable inferences in her favor, her commission of six of the remaining seven policy violations is beyond dispute. Three of these violations involved a failure to investigate allegations of renewed criminal activity by Ms. Felix: (1) the allegation by Ms. Carson, Ms. Felix's roommate, that Ms. Felix had stolen her clothing and forged her checks; (2) the allegation by Rentaway Rent A Center that Ms. Felix left with its property; and (3) the allegation by Ms. Felix's employer that she had forged checks relayed to Ms. Officer by Ms. Hahn. *See supra* at 5. Ms. Officer claims that these three failure to investigate violations are "false" because Ms. Officer subjectively believed that it was impossible for Ms. Felix to have committed the crimes alleged. However, Ms. Officer's subjective beliefs were immaterial; Ms. Officer was charged with failing to fulfill her duty under Corrections Department policy to *investigate* the allegations and this she admittedly failed to do.

---

[6](...continued)
policy requiring just such a recording, we are constrained to find these statements permissible of no interpretation other than an admission of the violation.

The following three policy violations can be grouped together because they involved in one way or another the phantom pregnancy: (1) Ms. Officer failed to follow up on the fact that a different employer in May and June of 2002 contacted Ms. Officer regarding Ms. Felix's poor work attendance, possible theft, and the employer's suspicion that Ms. Felix was not in fact pregnant; (2) Ms. Officer failed to obtain, as required by Corrections Department policy, documentation of Ms. Felix's medical restriction (i.e., her pregnancy); and (3) Ms. Officer failed to document again Ms. Felix's medical restriction in order to permissibly absolve Ms. Felix of her responsibility to engage in community service work. In response to these violations, Ms. Officer repeatedly asserts that "Ronda really did not have to work according to Judge Friedel's instructions." Appellant's Br. 32, Aple. App. 162. But Ms. Officer cites nothing but her own deposition testimony to support this claim about the content of Judge Friedel's instructions. In any event, the relevant Corrections Department policy does not provide that compliance with a documentation requirement is excused if a judge recognizes a medical condition. *See* Aple. App. at 382. Indeed, even if the judge remarked on Ms. Felix's putative pregnancy as Ms. Officer testified, we have no reason to believe the judge did not rely, after the hearing during which Ms. Felix appeared to be pregnant, on the representations of Ms. Officer herself that Ms. Felix was indeed pregnant. *See supra* at 8; *see also* Aple. App. at 163 (Ms. Officer admits that Judge Friedel relied on information she provided to him after the court hearing

regarding Ms. Felix's pregnancy).  The judge had, after all, no independent means for assessing whether or not Ms. Felix was pregnant; that duty belonged to probation staff – not the court.

Ms. Officer claims that the remaining policy violation in the Platt Memorandum is explained by a typographical error.  Ms. Officer was required to seek permission from Judge Friedel, the sentencing judge, prior to temporarily transferring Ms. Felix to Topeka, Kansas, where Ms. Felix desired to live for a period of time.  The electronic records that Ms. Officer entered stated that she sought permission from Judge Waller, not Judge Friedel.  Aple. App. at 160, 198.  Ms. Officer claims she did not violate the policy because she in fact asked Judge Friedel for permission, not Judge Waller.  In this instance, we bear in mind that we must look at the facts as they appear to the person making the decision to terminate plaintiff.  *Young*, 468 F.3d at 1250.[7]  On the record before him, Mr. Masterson had every reason to believe, by Ms. Officer's own hand, that she contacted Judge Waller, and not Judge Friedel as required; further, Ms. Officer provides no evidence that she came forward with her claim of typographical error any time prior to her termination.

---

[7]  That is, "the relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs."  *Young*, 468 F.3d at 1250 (quoting *Rivera v. City and County of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004)).

Ms. Officer claims that the third specific finding cited by the Masterson Memorandum – that she had a pattern of deficient job performance – was also false, this time by virtue of her ten years of service without disciplinary action and satisfactory performance evaluations. We have previously found pretext on the basis of past performance evaluations when there is a "glaring contradiction" between the plaintiff's performance evaluations and the employer's stated reasons for the termination. *See Cole v. Ruidoso Mun. Schs.*, 43 F.3d 1373, 1380 (10th Cir. 1994). But we, like the district court, are unable to see how Ms. Officer might meet this standard. While Ms. Officer may not have been subject to disciplinary action such as demotion or suspension, she did receive a memorandum of concern and her job evaluations repeatedly identified significant shortcomings in her performance, particularly regarding her inability to emotionally detach from her probationers and view their indiscretions seriously and her failure to follow Corrections Department policy – shortfalls that became particularly acute in the Felix episode. *See supra* at 2 n.2, 4 n.3. Simply put, we see no glaring contradictions between the stated reasons for her discharge and her periodic employment reviews.

Having concluded that every single violation identified in the Platt Memorandum was true or, at the very least, was reasonably believed to be true by the decision-maker, and given the lengthy record of Ms. Officer's failure to abide Corrections Department policies, we are constrained to affirm the district court's

holding that Ms. Officer cannot on this record prove pretext by suggesting that the County's proffered race-neutral reasons were false.

2. *Progressive Discipline Policy.* Ms. Officer argues that pretext can be inferred because Mr. Masterson violated the County's progressive discipline policy by terminating her even though she "had no prior disciplinary actions against her," and the four violations identified in the Platt Memorandum which she admits to were "not of such significance or public danger to warrant immediate termination." Appellant's Br. 51-52. But, the discipline policy in effect when Ms. Officer was terminated bestowed Mr. Masterson with discretion to impose any of the following forms of discipline – verbal counseling, written reprimand, suspension without pay, demotion and termination, Aple. App. at 172, 583; that is, County policy did not *require* Mr. Masterson to dispense a less severe form of punishment, *id.* at 172. Mr. Masterson concluded, moreover, that the most severe form of discipline was appropriate in this case because, in his view, Ms. Officer's mishandling of Ms. Felix's case "not only harmed the client but jeopardized public safety" and "represente[ed] a pattern of deficiencies in job performance detailed in the personnel file." *Id.* at 391. Whether or not we agree with that conclusion, we are not entitled to act as a "super personnel department that second guesses employers' business judgments." *Simms v. Oklahoma ex rel. Dept. of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999) (quotation omitted). It is dispositive for our purposes as a reviewing court

- 19 -

that Mr. Masterson's decision to terminate Ms. Officer was within the discretion afforded to him by the relevant discipline policy and not, as we have previously held, pretext for discrimination.[8]

3. *Statistical Evidence of Racial Animus.* The Supreme Court in *McDonnell Douglas* noted that use of statistics "may be helpful" to determine whether the employer had a "general policy and practice" of racial discrimination. 411 U.S. at 804-05. However, the Court cautioned that "such general determinations, while helpful, may not be in and of themselves controlling as to an individualized hiring decision, particularly in the presence of an otherwise justifiable reason for refusing to rehire." *Id.* at 805 n.19.

Ms. Officer claims that Ms. Platt recommended, and Mr. Masterson fired, a disproportionately large number of minorities and that this is evidence of their racial animus. Appellant's Br. 51. Ms. Officer alleges that over the course of

---

[8] Worthy of brief comment is Ms. Officer's assertion in her brief and at oral argument that she was the County's "scapegoat" and was fired in order to assuage fears that dangerous probationers like Ms. Felix were not being supervised appropriately. We note that, so long as the employee was not chosen as the scapegoat for discriminatory reasons, Title VII does not make it unlawful for an employer to create scapegoats as a method for dealing with bad press; rather, Title VII forbids only those adverse employment actions taken because of an employee's race, color, religion, sex or national origin. *See, e.g., Aramburu v. The Boeing Co.*, 112 F.3d 1398, 1406 (10th Cir. 1997) ("An animus not related to [plaintiff]'s ancestry, such as a personality conflict with [his supervisor], is not evidence of improper discrimination."). An employee may also, under certain circumstances, properly bring a tort claim. *See, e.g., Luisi v. JWT Group, Inc.*, 128 Misc. 2d 291 (N.Y. Sup. Ct. 1985) (former advertising executive successfully pleaded libel claim where press release issued by former employer used plaintiff as the scapegoat for accounting irregularities).

approximately five years, Ms. Platt had only recommended for termination two African-Americans and one Native-American – and that Mr. Masterson terminated two of these individuals, with the third resigning after his pre-termination hearing.[9] Ms. Officer fails to explain how such a small sample – three persons over five years – can permit the generation of statistically *significant* data suggestive of discrimination, especially in light of the County's uncontroverted evidence in the record of poor job performance by these individuals. *See, e.g., Mayor of City of Philadelphia v. Educ. Equal. League*, 415 U.S. 605, 620-21 (1974) (simplistic percentages highlighting unbalanced racial composition were held to be meaningless where the composition was explained by other factors (i.e., qualifications unrelated to race) and the sample size was too small to be significant).

*4.    Disparate Treatment.*    Of course, Congress did not leave without recourse plaintiffs who are unable to generate statistically significant data but wish to prove their Title VII claims by reference to the treatment of fellow employees; in such cases, a Title VII plaintiff may prove discrimination by showing disparate treatment between herself and similarly situated nonprotected

---

[9] Ms. Officer contradicts herself as to the number of employees terminated by Mr. Masterson.  Initially she alleges that he terminated a total of three employees.  *See* Appellant's Br. 41.  Subsequently, she claims that he terminated three African-Americans, *see* Appellant's Br. 51; however, she provides no citation to the record nor identifies this additional African-American raising the tally.  We assume that this was a typographical error since there is no evidence in the record before us of a third African-American employee subject to a pre-termination hearing by Mr. Masterson.

- 21 -

employees. Ms. Officer alleges this as well, contending that Mr. Masterson violated an unwritten policy by treating a similarly situated, nonprotected employee who violated a work rule of comparable seriousness, differently. *See Green v. New Mexico*, 420 F.3d 1189, 1194 (10th Cir. 2005). Specifically, Ms. Officer claims that Steve Kalocinski, a Caucasian male was similarly situated to her but was demoted rather than terminated. Appellant's Br. 52, 60-61.

In order to prove disparate treatment, however, it is axiomatic that Ms. Officer must prove she was "similarly situated" to Mr. Kalocinski and violated work rules of comparable seriousness. *Kendrick*, 220 F.3d at 1232. Under our precedent, an employee "is similarly situated to the plaintiff if the employee deals with the same supervisor and is subject to the same standards governing performance evaluation and discipline." *Id.* (quotation omitted). "A court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated." *Aramburu*, 112 F.3d at 1404. Not all differences in treatment are sufficient to establish a discriminatory intent; we have explained that "[d]ifferences in treatment that are trivial or accidental or explained by a nondiscriminatory motive will not sustain a claim of pretext." *Kendrick*, 220 F.3d at 1232.

In 1999, after Mr. Kalocinski received a negative review, he voluntarily requested, and was granted, a demotion from his position as an ISO III (a

supervisor like Ms. Nash) to an ISO I (Ms. Officer's position) in the Juvenile Field Services Division. Aple. App. at 553-54. Two years later, in November of 2001, Mr. Kalocinski was placed on a 90-day disciplinary probation for unsatisfactory work performance as an ISO I due to three incidents: (1) allowing a juvenile client to enter a secure building even though the client did not successfully pass through a metal detector, (2) allowing a juvenile client to walk unescorted out of his sight in a secure building, and (3) failing to scan the parent of a juvenile client who was unable to pass through the metal detector successfully. *Id.* at 557. He was also reprimanded for keeping an aluminum bat with the word "compliance" on it in his desk. *Id.* at 555-56. In March 2002, after Mr. Kalocinski failed to complete his disciplinary probation period successfully, Mr. Masterson demoted Mr. Kalocinski from an ISO I to a corrections worker and resassigned him to the adult intermediate sanction and services center. *Id.* at 554-55.

In this case, we are constrained to conclude that Mr. Kalocinski was not similarly situated to Ms. Officer – his work history and conduct sufficiently distinguished him from Ms. Officer. Mr. Kalocinski had previously occupied the position of corrections worker and was successful at that position. Aple. App. at 555. At the time he was demoted to corrections worker, his prior supervisor and the then-current corrections worker supervisor, told Mr. Masterson that she had a vacant position "and was receptive and felt that he could be successful in it." *Id.*

Furthermore, Mr. Masterson felt that Mr. Kalocinski had a good working relationship with probationers but his problems as an ISO III and I in the juvenile services division were due to his inability to "be organized enough to do the job at the level required." *Id.* By contrast, Ms. Officer had no prior work experience as a corrections department worker, had no supervisor vouching for her competence, and the problem work areas identified by her employer were not confined to organizational skills.

The conduct leading to Mr. Kalocinski's demotion is also of a different character than Ms. Officer's. Mr. Masterson had before him reports of isolated incidents of Mr. Kalocinski failing to abide discrete building safety requirements by permitting juvenile probationers, and in one instance parents of a client, to enter into Corrections Department buildings without passing through a metal detector successfully. Meanwhile, Ms. Officer was charged by the County with repeatedly refusing to report her probationers' failure to comply with probation conditions as required; failing to follow Corrections Department documentation policies; and repeatedly taking her probationers' word above all others, which almost led, in the case of Ms. Felix, to disastrous results. Mr. Masterson articulated the reasons he did not feel it was appropriate to demote her to the position of corrections worker as follows:

> [Ms. Officer d]oesn't follow policies the way they are intended, doesn't follow her supervisor's guidance in how she needs to correct, doesn't follow up on reports of criminal behavior, tends to side with clients versus gathering the information, doesn't present the

- 24 -

information to judges, is perceived by the people that depend on her to do this job to not carry it out in a way that leads to trust of her judgment. And in a residential setting, a corrections worker would not be successful if they carried out their job in that way.

Aple. App. at 552.

Because Ms. Officer and Mr. Kalocinski's work histories and conduct are significantly distinguishable, under our precedent the County "must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct." *Kendrick*, 220 F.3d at 1233; *see also Salguero*, 366 F.3d at 1177 (holding that facts identifying significant differences in conduct among employees under investigation warranted different levels of discipline and thus was insufficient to show disparate treatment). Ms. Officer's subjective assessment that she would have been successful as a corrections worker is not sufficient for us to override Mr. Masterson's beliefs because, so long as it is not tainted by impermissible animus, "[i]t is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of [her] own relative performance." *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996).

## B

In addition to seeking to remedy workplace discontent, Title VII proscribes retaliation against employees who voice opposition to, or participate in an investigation or proceeding alleging, a violation of Title VII by his or her employer. 42 U.S.C. § 2000e-3(a); *see also Burlington N. & Santa Fe Ry. Co. v.*

*White*, – U.S. –, 126 S.Ct. 2405, 2415 (2006). In order to establish a prima facie case of retaliation, a plaintiff must show that: (1) he or she engaged in protected opposition to discrimination; (2) a materially adverse action by the employer followed; and (3) a causal connection exists between the protected activity and the adverse action. *Kendrick*, 220 F.3d at 1234. A plaintiff "may establish the causal connection by proffering evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239-40 (10th Cir. 2004) (quotation omitted). As in the discrimination context, where there is only indirect evidence of retaliation, the *McDonnell Douglas* framework governs. *See Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004). In this case, the district court found, and we agree, that the plaintiff failed to present a prima facie case of retaliation.

Ms. Officer briefly argues that she was discharged in retaliation for sending a memorandum in 1997 to Ms. Platt copying, among others, the then-current Director of the Corrections Department, Ken Hales. Aple. App. at 127. The memorandum expressed concern that the racial make-up of the ISOs in Ms. Officer's department did not "mirror" that of its probationers; namely, that there was a disproportionate number of African-American male probationers to African-American male ISOs. *Id.* at 127-28. Ms. Officer also offered to recruit on behalf of the Corrections Department if requested. *Id.* at 127. Ms. Officer

alleges that only Ms. Platt responded to her memorandum and that her response was that Ms. Officer ought not to concern herself with these sorts of personnel issues. *Id.* at 127.

The district court ruled, first, that Ms. Officer's memorandum did not constitute "protected opposition" for Title VII purposes because Ms. Officer advocated for affirmative efforts to hire more African-American ISOs and did not allege that her employer had engaged in any discrimination against African-Americans or any other employment practice made unlawful by Title VII. The district court held that Ms. Officer's claim also failed because she had not presented any evidence suggesting that her activities in 1997 had any causal effect on her termination in 2002.

The question whether Ms. Officer's activities qualify as protected opposition appears to be a relatively novel one and she cites to us no appellate authority on point. We need not decide that question, however; even assuming that Ms. Officer did engage in protected activity in 1997, we are constrained to agree with the district court's causation analysis. The individual who was responsible for her termination, Mr. Masterson, testified that he had not seen Ms. Officer's 1997 memorandum until he was deposed in this case – well after he terminated Ms. Officer – suggesting that his decision to discharge her could not have been in retaliation for her submission of the memorandum. Aple. App. at 174. On appeal, Ms. Officer does not provide us with any evidence or argument

that might lead a juror to disbelieve this testimony (*see* Appellant's Br. 65-66); though her burden was a light one – Ms. Officer simply had to come forward with some direct or circumstantial evidence, or even a reasonable inference therefrom, suggesting that Mr. Masterson had seen her 1997 recommendation – she simply did not pursue the matter before us.[10]  In *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993), we rejected a Title VII claim on this same basis, holding that a "plaintiff must show that the individual who took adverse action against [her] knew of the employee's protected activity."  We see no basis for a different result here.

✳   ✳   ✳

For the foregoing reasons, we AFFIRM the district court's judgment.

ENTERED FOR THE COURT


Neil M. Gorsuch
Circuit Judge

---

[10] For example, assuming that the decision-maker is aware of the protected opposition, a jury can of course infer causation from a close nexus in time between the protected activity and the alleged retaliatory action; here, however, five years passed between those two events and precedent precludes us from allowing any inference of causation given the passage of so much time.  *See Kendrick*, 220 F.3d at 1234 (a lapse of one year between the opposition and the alleged retaliation is too remote to support any inference of a causal connection); *see also Stover*, 382 F.3d at 1074 (collecting cases).