**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**November 9, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

EVERETT YOUNG,

      Plaintiff-Appellant,

v.

DILLON COMPANIES, INC., a/k/a
KING SOOPERS, INC.,

      Defendant-Appellee.

No. 05-1378

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 04-CV-0590-ZLW-MJW)**

Andrew T. Brake, (Lee T. Judd on the briefs) Andrew T. Brake, P.C., Englewood, Colorado, for Plaintiff-Appellant.

William A. Wright, Sherman & Howard L.L.C., Denver, Colorado (Raymond M. Deeny, Sherman & Howard L.L.C., Colorado Springs, Colorado, with him on the brief), for Defendant-Appellee.

Before **LUCERO**, **O'BRIEN**, and **GORSUCH**, Circuit Judges.

**GORSUCH**, Circuit Judge.

Everett Young seeks damages from his former employer, Dillon Companies, Inc. ("Dillon"), alleging that his discharge violated Title VII, was inconsistent with the

parties' implied contract terms, and ran afoul of the doctrine of promissory estoppel. Finding that Mr. Young failed to identify a triable issue, the district court granted summary judgment for Dillon on all counts. Our review confirms that, on the limited record developed by plaintiff during discovery, entry of summary judgment was appropriate.

I.

From August 2001 through January 2003, Mr. Young worked as a retail investigator in various of Dillon's King Soopers grocery stores in Colorado. At the time Mr. Young accepted the job with Dillon, he received (and signed for) a personnel manual. Pertinently for our immediate purposes, the manual provided that "[a]ll time card, time clock, or time and attendance entries must be accurately completed and reflect the true hours worked," and that "[r]ecording time on your time card, time clocks, or time and attendance for work not performed will be considered in violation of this policy, leading to disciplinary actions up to and including termination." *See* Appellant's App. at 123, 124. Upon taking the job, Mr. Young also received training during the course of which, he asserts, he was instructed that "just sleeping on the job [would lead to] immediate termination." *See id*. at 91 [275:23-276:4].

On January 14, 2003, after nearly a year and a half of service as an investigator policing those who would steal from Dillon's grocery stores, Dillon fired Mr. Young on the putative ground that he had engaged in "theft of time," or seeking pay for hours not actually worked. According to Dillon, security cameras revealed that, on January 11,

-2-

2003, Mr. Young left more than two hours before his shift ended; failed to punch out when he departed; and then, in Dillon's so-called "transfer log" where employees record their working hours every week, misrepresented that he had stayed until the end of his shift. For his part, Mr. Young claims that he worked a full shift, innocently neglected to punch out at the end of his shift, and returned to work later that night to punch out. Mr. Young also asserts that he recorded the true time of his departure in the transfer log and that, in any event, he was not sleeping on the job and therefore could not be properly subjected to immediate termination.

As of January 11, Mr. Young was already under investigation by Dillon because of a store manager's allegation that Mr. Young abused telephone privileges during work hours. As part of that investigation, Jon Lesley, Mr. Young's supervisor, began to review store security video recordings reflecting Mr. Young's on-the-job conduct. Viewing a recording from King Soopers Store Number 6 in Colorado Springs, where Mr. Young was assigned to work on January 11, 2003, from 2 p.m. to 10:30 p.m., Mr. Lesley observed that at 8:00 p.m., Mr. Young put on his coat, collected his briefcase, and left the "camera room" where, as part of his job, he was watching security video feeds from various locations around the store. The store's video recordings show that Mr. Young proceeded to leave the store and head into the parking lot. Video from the camera room further confirms that Mr. Young did not return there before the end of his shift at 10:30 p.m.

After viewing the video, Mr. Lesley consulted Mr. Young's time keeping records. Mr. Young was required to "punch out" at the close of every shift using an electronic time card system. *See* Appellant's App. at 55, 104 [70:13-16]. In addition, at the end of each work week, Mr. Young was supposed to leave the store where he was working that day fifteen minutes before the end of his shift, travel to his home store, and record the hours he worked that week in the transfer log. *See id.* at 55, 74 [191:3-13]. Upon review, Mr. Lesley found that, though January 11 represented the end of his work week, Mr. Young did not fill out his transfer log at the close of his shift as directed. Instead, video from Mr. Young's home store showed that he appeared there at 5 a.m. the following day, January 12, to complete his transfer log. In the log itself, Mr. Young represented that he had worked until 10:30 p.m. the previous evening.

Mr. Lesley also consulted an administrative assistant at Mr. Young's home store, Tina Hammer, about Mr. Young's electronic time card entries for January 11. Ms. Hammer apparently reported that the electronic time card system did not return any departure time for Mr. Young in the 10:30 p.m. "time slot." *See id*. at 104-05 [72:21-73:6]. Mr. Lesley apparently took this to mean that Mr. Young did not punch out at all on the evening of January 11.[1]

---

[1] Mr. Young represents that Ms. Hammer showed the electronic time card reports to Mr. Lesley, but the record citations he provides for this proposition fail to support this assertion. *See* Appellant's Br. at 11. The only pertinent record testimony suggests just the opposite to be true – *viz.*, while Mr. Lesley reviewed transfer log records, after hearing from Ms. Hammer that she found no electronic time records for Mr. Young in the 10:30 p.m. "time slot," he did not pursue the issue further. *See* Appellant's App. at 104-05 [72:8-73:22], 109-10 [100:20-101:8].

Based on the facts he had before him – the video from Store 6, a review of Mr. Young's transfer log, video from his home store, and his consultation with Ms. Hammer about the electronic time card records – Mr. Lesley concluded that Mr. Young had left work early on January 11. Because store video feeds are "copied over" routinely, Mr. Lesley proceeded to transfer for preservation onto a video tape what he considered to be the relevant video reflecting Mr. Young's conduct.[2] Then, on January 14, 2003, Mr. Lesley met with Mr. Young to discuss his findings. Mr. Young denied leaving early. When told that video showed him leaving at 8 p.m., Mr. Young replied that this "was impossible." *See id*. at 75 [193:14-19]. Mr. Young asserted that he punched out on the electronic time card system at the end of his shift, "which would have been 10:30." *See id*. at 74 [192:22-23].

Mr. Lesley was unpersuaded and reported his belief that Mr. Young had left work early to his supervisor, Jerry Riblett, King Soopers' Director of Security. It is undisputed that Mr. Lesley further supplied Mr. Riblett with a faithful account of Mr. Young's version of the events of the evening in question. Mr. Riblett, in turn, reviewed the materials provided by Mr. Lesley, including the recorded video and transfer log; concurred with Mr. Lesley's findings; and proceeded to discuss the matter with Stephanie Bouknight, King Soopers' Manager of Labor and Employee Relations. Together, Mr.

---

[2] Mr. Young complains that Dillon should have retained additional video from the night in question but does not argue intentional spoliation by Dillon; nor does he contend that Dillon did anything other than follow its normal procedures with respect to the preservation of such records.

Riblett and Ms. Bouknight decided to terminate Mr. Young. Mr. Riblett conveyed the decision to Mr. Lesley who, in turn, informed Mr. Young of his termination.

This lawsuit followed. In his complaint, Mr. Young, an African American, alleged that he was fired because of his race and that Dillon either breached its contract with him or acted in a manner that contravenes the doctrine of promissory estoppel. During the course of discovery, Mr. Young received, among other things, electronic time card records reflecting that, while he did not punch out at his appointed departure time of 10:30 p.m. as Ms. Hammer reported to Mr. Lesley, he did in fact punch out later, at 11:58 p.m. At his deposition, Mr. Young testified that he realized that he had forgotten to punch out after he arrived home and returned to the store to do so. *See* Appellant's App. at 82 [230:23-231:7]. He also testified that, between 8 and 10:30 p.m., he walked inside and outside of the store checking on the security of, among other things, certain gas tanks stored behind the building. *See id.* at 75 [195:4-11], 82 [232:18-25]. Mr. Young, however, apparently did not share either of these points with Mr. Lesley prior to his termination, but instead told Mr. Lesley merely that he didn't "recall exactly what time" he had punched out and that he "punched out at whatever time my shift was to end, which would have been 10:30." *Id.* at 74 [192:21-23]; *see also id.* at 75 [195:25-196:3] ("[A]ll I could tell [Mr. Lesley] was whatever time I punched out is when I left at the end of my shift. We weren't talking about propane tanks or going to cars or nothing else of that nature.").

-6-

After a hearing on defendant's motion for summary judgment, the district court

issued an oral ruling for defendant on all of Mr. Young's claims against Dillon. With

respect to plaintiff's discrimination claim under Title VII, 42 U.S.C. § 2000e, *et seq.*, the

district court held that:

> [T]he law is that the employer's reasons do not have to be correct, they have to be
> honestly believed and acted on in good faith. And in this case, we have a video
> showing [Mr. Young] putting on his coat and leaving the place where he was
> supposed to be at 8 o'clock. We have no indication, even though the video
> continues, that he came back to that room. And all of this explanation about
> checking propane and walking around the store was not adequately explained to
> King Soopers initially when they asked him about leaving late. . . . [T]here is more
> than adequate proffered testimony and reasons that defendant honestly believed
> that he left early, lied about where he was, and if they did honestly believe, that is
> sufficient.

*See* Appellant's App. at 274-75. With respect to Mr. Young's breach of contract claim,

the district court held that neither the employee manual nor the alleged statements during

training constituted an enforceable contract. *Id.* Finally, the district court dismissed Mr.

Young's promissory estoppel claim "not only because [Mr. Young] has failed to identify

a policy in an employee manual that [Dillon] failed to follow, but because [Mr. Young]

could not have reasonably relied on the statement [allegedly made during] training that

the only terminable offense was sleeping on the job." *Id.* at 276.

## II.

We review the district court's grant of summary judgment de novo. *See Stover v.*

*Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004). Summary judgment is appropriate if

"the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In conducting our analysis, we view all of the facts in the light most favorable to the non-movant and draw all reasonable inferences from the record in favor of the non-moving party. *See Stover*, 382 F.3d at 1070.[3]

A.

Where, as here, a Title VII plaintiff relies on indirect or circumstantial evidence to show discrimination, we examine the claim under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000). Under *McDonnell Douglas*, the plaintiff carries the initial burden of establishing a prima facie case of racial discrimination. *See Kendrick*, 220 F.3d at 1226 (discussing *McDonnell Douglas*, 411 U.S. at 802-04). Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for the adverse employment action. *Id*. If the defendant makes this showing, the burden then shifts back to the plaintiff to show that the defendant's proffered justification is pretextual. *Id*.

The parties agree that Mr. Young has made out a prima facie case of race discrimination and that Dillon has put forth a legitimate, non-discriminatory reason for

_____

[3] The district court had jurisdiction over Mr. Young's Title VII claims pursuant to 42 U.S.C. § 2000e, *et seq.*, and 28 U.S.C. § 1331. With respect to his state law claims, the complaint alleges facts sufficient to invoke diversity jurisdiction under 28 U.S.C. § 1332, as well as the exercise of supplemental jurisdiction under 28 U.S.C. § 1367. We have jurisdiction over the appeal under 28 U.S.C. § 1291.

Mr. Young's termination.  *See* Appellant's Br. at 25-29; Appellee's Br. at 22-23.  Thus, all that remains before us is to decide whether a genuine issue of material fact exists as to whether Dillon's proffered reason for discharging Mr. Young was pretextual.  That is to say, we must determine whether there is evidence from which a reasonable fact finder could conclude that Dillon fired Mr. Young on account of his race rather than, as Dillon claims, because of his alleged attempt to get paid for hours not actually worked.  To show that the defendant's proffered race-neutral reasons were actually a pretext for discrimination, this Court has held that the plaintiff must demonstrate that the defendant's "proffered [race-neutral] reasons were so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief."  *See Stover*, 382 F.3d at 1076.  Mr. Young seeks to show pretext in a couple of different ways meriting mention here.

1.

Mr. Young argues that he worked until the completion of his shift, that Dillon's assertion otherwise is false, and that Dillon's racial animus can be inferred from the falsity of its proffered race-neutral reason for the termination.  The Supreme Court has recognized that "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).  "Thus, a plaintiff's prima facie case, combined with *sufficient evidence* to find that the employer's asserted justification is false, *may permit* the trier of fact to

conclude that the employer unlawfully discriminated." *Id.* at 148 (emphases added). But the nature and quantum of plaintiff's proof is key, for the Supreme Court has also explained that evidence about the falsity of an employer's proffered race-neutral explanation for termination will not "*always* be adequate to sustain . . . liability." *Id.* at 148 (emphasis in original).

Discussing the quantum of evidence required by *Reeves*, this Court has held that, "[i]n drawing [a *Reeves*-type] inference, the factfinder must be able to conclude, based on a preponderance of the evidence, that *discrimination was a determinative factor* in the employer's actions–simply disbelieving the employer is insufficient." *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005) (emphasis added). This Court has further explained, post-*Reeves*, that "[t]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City and County of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) (internal quotation marks and alteration omitted); *see also Kendrick*, 220 F.3d at 1231 ("[A] challenge of pretext requires us to look at the facts as they appear to the person making the decision to terminate plaintiff."). Thus, the relevant "falsity" inquiry is whether the employer's stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue, or whether plaintiff can show that the employer's explanation was so weak, implausible, inconsistent or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination. *See Rivera*, 365 F.3d at 924-25. The

reason for this rule is plain: our role is to prevent intentional discriminatory hiring practices, not to act as a "super personnel department," second guessing employers' honestly held (even if erroneous) business judgments. *See Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir. 2004).

As the district court observed, Mr. Young offers no evidence that Mr. Riblett and Ms. Bouknight honestly believed anything other than that Mr. Young had left work early, that he intentionally misrepresented his time in the transfer log, and that he sought to obtain pay for work he never performed. Nor does Mr. Young dispute that Mr. Riblett and Ms. Bouknight had before them video showing him leaving the store early, not returning to the camera room, and failing to complete his transfer log at his home store at the end of his shift as instructed.

Disputing none of this, Mr. Young emphasizes the electronic time card record showing that he punched out at 11:58 p.m., as well as his deposition testimony explaining that he was busy after 8 p.m. walking around inside and outside the store. This evidence may very well cast doubt on Dillon's conclusion that Mr. Young left early, but, as the district court observed, there is no evidence that these facts were known to the relevant decision makers within Dillon at the time they made their decision to fire Mr. Young. To the contrary, the record indicates that the first time Mr. Riblett and Ms. Bouknight learned of these claims was in the course of discovery in this litigation. The electronic time card evidence unearthed during discovery was not presented to either decision maker before they made the decision to terminate Mr. Young's employment. Neither did Mr. Young

come forward with an explanation of his whereabouts during the relevant time period when he was interviewed by Mr. Lesley. Accordingly, while evidence amassed during discovery may well suggest that Dillon's beliefs about Mr. Young were wrong, they do not suggest those beliefs were held in bad faith.

Nor are we pointed to facts suggesting that relevant evidence was deliberately suppressed from the decision makers or ignored in order to further a discriminatory purpose. It is undisputed that Mr. Lesley reviewed video and the transfer logs; inquired with Ms. Hammer about the content of Mr. Young's electronic time card records; passed along her finding that there was no indication that Mr. Young punched out in the 10:30 p.m. "time slot"; offered Mr. Young a chance to respond to the facts as Mr. Lesley understood them; and accurately reported his findings and Mr. Young's responses to Mr. Riblett and Ms. Bouknight. While in hindsight perhaps more might have been done, we are given no reason on the record before us to conclude that the investigation's limits were the result of an improper racial animus.

The facts before us are very much like those we faced in *Kendrick*. There the plaintiff was discharged for insubordination, including allegedly pushing a supervisor. *See Kendrick*, 220 F.3d at 1224. For the purpose of ruling on the defendant's motion for summary judgment, we assumed that the plaintiff's statement that he did not push his supervisor was true. *Id*. at 1231. But the evidence also showed that the decision maker believed – based on another employee's report – that the plaintiff had, in fact, pushed his supervisor. *Id*. at 1232. And we found no evidentiary basis suggesting that the decision

maker came to this belief in bad faith. *Id*. at 1231-32. As a result, while the decision

maker's conclusion about the plaintiff's conduct may have been wrong, we saw no basis

on which a reasonable fact finder could have found that it was not honestly held. *Id.* We

find ourselves in much the same, if difficult, position in this case.

Mr. Young argues that *Plotke v. White*, 405 F.3d 1092 (10th Cir. 2005), held that

pretext is sufficiently shown for summary judgment purposes whenever a plaintiff

demonstrates that the "true facts" associated with a termination differ from what the

employer honestly believed to be the case. Nothing in our panel opinion in *Plotke*,

however, purports to (or could) reverse our prior rulings in *Kendrick* and *Rivera* requiring

us to look to the facts as they appeared to the decision maker. Rather, we simply held in

*Plotke* that the plaintiff there had succeeded in presenting sufficient facts such that a

reasonable fact finder could conclude that the decision maker's proffered good faith

reason for termination was spurious, given the facts known to the decision maker at the

time. *See Plotke*, 405 F.3d at 1103-08. In aid of that conclusion, we noted that the

defendant's proffered reason for termination was generated only *after* the termination, a

factor that we have long held significant in assessing claims of pretext, *id.* at 1103, but

one that simply is not present here. We also pointed to evidence suggesting, *inter alia*,

that the defendant fabricated documentation relating to the termination and failed to

follow its own written termination procedures, and that other senior supervisors employed

by defendant believed there was no evidence of misconduct by the plaintiff. *Id.* at 1103-

08. Again, no evidence of this kind – evidence bearing directly on whether the defendant

authorized a termination in good faith or instead sought to pursue a discriminatory purpose through subterfuge – exists in the record before us.

2.

Mr. Young next argues that pretext can be inferred because Mr. Lesley is allegedly biased against African Americans. In support of this claim, Mr. Young alleges that Mr. Lesley has made certain statements that, we agree, evince a deep and repugnant racial animus. With one exception we shall discuss shortly, however, Mr. Young's assertions do not concern statements he personally heard Mr. Lesley make. Rather, they concern statements Mr. Lesley allegedly made to other employees and which were subsequently conveyed, second-hand, to Mr. Young. That is, Mr. Young's testimony rests on hearsay. Had counsel secured sworn statements or testimony from those employees who allegedly heard Mr. Lesley's remarks first-hand, this case might be in a very different posture. As it is, however, we do not have direct testimony from the individuals to whom Mr. Lesley allegedly made racist remarks; the defendant has lodged a hearsay objection to the admission or consideration of these statements; and Mr. Young has pointed us to no applicable exception to the hearsay rule. We are thus required to abide our precedent and refrain from considering these matters on summary judgment. *Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1555 (10th Cir. 1995) ("Today, we align ourselves with this line of

authority and hold that Rule 56 precludes the use of inadmissible hearsay testimony in depositions submitted in support of, or in opposition to, summary judgment.").[4]

The single racial epithet for which Mr. Young is able to provide first-hand testimony concerns an episode when Mr. Lesley allegedly referred to an African American store manager as a "monkey." Dillon does not dispute that such a remark, made in the context alleged, is a derogatory racial epithet. Instead, Dillon argues that, even if a discriminatory bias is proven with respect to one of defendant's employees, there must be some evidence in the record suggesting that the plaintiff's termination at issue was infected by such bias; under this test, Dillon adds, Mr. Young's claim fails because he has not pointed to any evidence in the record suggesting that Mr. Lesley's alleged animus affected Mr. Young's review and termination.

Like the district court, we feel constrained by our precedent to agree. In *Rea v. Martin Marietta Corp.*, 29 F.3d 1450 (10th Cir. 1994), this Court expressly held that a plaintiff who fails to show any connection between her supervisor's discriminatory comments about another employee and her own termination, without more, fails to satisfy the burden imposed by Congress under Title VII of proving that the adverse action was caused by unlawful discriminatory animus. *Id.* at 1457; *see also English v. Colo. Dep't of Corr.*, 248 F.3d 1002, 1010 (10th Cir. 2001). In order to state a claim under Title VII, we

_____

[4] Mr. Young also cites as evidence of racism Mr. Lesley's investigative techniques, such as rifling through his trash can and smelling his coffee cup (ostensibly for alcohol). But Mr. Young fails to point us to evidence suggesting that Mr. Lesley subjected similarly situated non-minority employees to any different (albeit zealous) treatment.

-15-

have repeatedly explained that "the plaintiff must demonstrate a nexus between the allegedly discriminatory statements and the defendant's decision to terminate her." *Rea*, 29 F.3d at 1457. And, to demonstrate such a causal nexus, we have held that the plaintiff must show that "the allegedly discriminatory comments were directed at [her], her position, or the defendant's policy which resulted in the adverse action taken against the plaintiff." *Id*.; *see also English*, 248 F.3d at 1010.

To be sure, we have recognized that a racially biased investigator can issue reports and recommendations influenced by his or her bias and thereby cause decision makers who rely on those reports to fire an employee unlawfully – a situation in which the biased investigator uses the supervisors as a cat's paw to effect his or her own biased designs. *See EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles,* 450 F.3d 476, 487 (10th Cir. 2006); *English*, 248 F.3d at 1011; *Kendrick*, 220 F.3d at 1231. In order to succeed under such a theory, however, a plaintiff must show that the allegedly biased investigator's discriminatory reports, recommendation, or other actions were the proximate cause of the adverse employment action. *See BCI*, 450 F.3d at 487-88. Thus, we have held that an unbiased supervisor can break the causal chain by conducting an "independent investigation" of the allegations against an employee. *See id*. at 488. Here, we cannot find the requisite causation given that Mr. Lesley merely conducted an investigation but made no recommendation to the decision makers or otherwise participated in the decision to terminate Mr. Young; he interviewed Mr. Young and transmitted Mr. Young's version of events to his superiors; and the relevant decision makers – who are not alleged to

-16-

harbor any racial animus – independently reviewed the video and timekeeping records for themselves before making their termination decision.

## B.

It is undisputed that Mr. Young was hired for an indefinite period of time and, thus, is an "at-will" employee under Colorado law, someone whose employment may be terminated lawfully by either party without reason or notice. *See Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708, 711 (Colo. 1987). Nonetheless, in addition to his Title VII claim, Mr. Young asserts that he was entitled as a matter of contract law or, alternatively, under the doctrine of promissory estoppel, to certain warnings prior to his termination.[5]

In *Evenson v. Colorado Farm Bureau Mutual Insurance Co.*, 879 P.2d 402, 408-09 (Colo. Ct. App. 1993), the Colorado Court of Appeals recognized that statements made to employees (there in an employee manual) prescribing when and how an employee may be terminated are, under certain circumstances, enforceable as a matter of implied contract even with respect to at-will employees. To ensure fairness and predictability in the law of contract, however, *Evenson* imposes strict limits on when Colorado courts will trump the parties' express agreement and imply additional terms between them. Among other things, the employer's conduct must be understood as: (a) conveying a willingness to be bound by the additional terms at issue; and (b) justifying the employee in thinking that his or her initial or continued employment would constitute

---

[5] The parties agree that Mr. Young's common law claims are governed by Colorado law. *See* Appellant's Br. at 14; Appellee's Br. at 11-19.

an acceptance of, and consideration for, the terms at issue. *Id.* at 409; *see also Keenan*, 731 P.2d at 711.

To state a claim for promissory estoppel, the Colorado Supreme Court has held that an employee must "demonstrate that the employer should reasonably have expected the employee to consider [its offer to the employee to be] a commitment . . . to follow the termination procedures, that the employee reasonably relied on the termination procedures to his detriment, and that injustice can be avoided only by enforcement of the termination procedures." *Keenan*, 731 P.2d at 712. The employee must also show that the employer's promise was "sufficiently specific so that the judiciary can understand the obligation assumed and enforce the promise according to its terms." *Soderlun v. Pub. Serv. Co. of Colo.*, 944 P.2d 616, 620 (Colo. Ct. App. 1997). If, however, a statement by an employer is "merely a description of the employer's present policies . . . it is neither a promise nor a statement that could reasonably be relied upon as a commitment." *Id.*; *accord George v. Ute Water Conservancy Dist.*, 950 P.2d 1195, 1199 (Colo. Ct. App. 1997).

Mr. Young claims he can satisfy the elements for implied contract or promissory estoppel by virtue of three pieces of evidence. As the district court concluded, however, none suffices as a matter of law.

*First*, Mr. Young points us to Ms. Bouknight's deposition testimony as Dillon's corporate representative. There, Ms. Bouknight explained her understanding that an employee who innocently fails to clock out "probably" will not be terminated for a first

-18-

offense. *See* Appellant's App. at 134 [42:2-11]. But we have no indication that the substance of Ms. Bouknight's after-the-fact deposition testimony was ever conveyed to Mr. Young during the course of his employment. Without proof on this score, we cannot treat these terms as having been impliedly conveyed and accepted for consideration by the parties for purposes of an implied contract or reasonably relied upon for purposes of promissory estoppel.

Even assuming that Ms. Bouknight's after-the-fact deposition testimony about her beliefs and understandings might alone provide the basis for recovery under a breach of implied contract or promissory estoppel theory, Mr. Young relies only on a snippet of her testimony. He fails to note that Ms. Bouknight also specifically testified that there is *no* mandatory progressive discipline system for *intentional* time keeping violations, and termination follows immediately whenever the evidence suggests that an employee fails to clock out with an intent to obtain pay for work never performed. *See* Appellant's App. at 189 [34:5-35:17] (noting that for intentional infractions of the time keeping policy, "[t]here is no progressive discipline" and "[if] you steal from the company, you get terminated from the company"). Thus, there is no indication that Dillon had done anything to modify the at-will relationship with Mr. Young, at least with respect to an intentional effort to cheat the time keeping system.

*Second*, Mr. Young points us to a statement allegedly made by an unidentified Dillon trainer indicating that, rather than being fired immediately for initial violations of the terms of employment outlined in the Dillon training manual, "you get written up," and

that the only basis for immediate termination is "sleeping on the job." *See* Appellant's App. at 91 [275:23-276:4]. But the employment manual provided to Mr. Young specifically states that the "failure to follow the[] policies and procedures [contained in the manual] may result in disciplinary action up to and including termination, which may include discharge *on the first offense*." *See id*. at 119 (emphasis added). The manual also outlines the timekeeping procedures and adds that "recording time on your time card, time clocks, or time and attendance for work not performed will be considered in violation of this policy, leading to disciplinary actions up to and including termination." *Id*. at 124. Mr. Young points us to no evidence suggesting that Dillon conveyed to him an intent to be bound by the trainer's alleged statements contradicting its policy manual, nor is there any evidentiary basis for us to find that such statements, if made, were made in such a way as to justify Mr. Young in thinking that they overrode the company's policy manual and that his employment constituted acceptance of the additional terms. *See Keenan*, 731 P.2d at 711; *Evenson*, 879 P.2d at 408-09. Indeed, the evidence on this score is very much to the contrary: Mr. Young conceded in his own deposition that it was his clear understanding that the intentional falsification of time records *was* an offense that would lead to immediate termination by Dillon. *See* Appellant's App. at 85 [242:2-6].

   *Third*, Mr. Young points us to a putative admission by Mr. Lesley during his deposition that he "failed to conduct a complete investigation." *See* Appellant's Br. at 22. In fact, however, Mr. Lesley only conceded that, had he seen Mr. Young's time cards for

-20-

himself (rather than rely on Ms. Hammer's description of them) and noticed that Mr. Young clocked out at 11:58 p.m., he "probably would have done a more in-depth investigation." *See* Appellant's App. at 109-110 [100:20-101:1]. As with Ms. Bouknight's testimony, we have no evidence suggesting that Dillon ever conveyed anything to Mr. Young during the course of his employment regarding the nature and scope of any investigation to which he would be entitled for alleged violations of the company's time keeping policies. In addition, Mr. Lesley's deposition testimony merely indicates what additional process might have been due *if* certain additional information had been before him. It does not, by itself, suggest that Mr. Lesley was obliged by any company procedure (let alone by terms communicated to Mr. Young during his employment) to seek out that additional information on his own initiative – that is, to review the electronic punch cards himself rather than (as he did) rely on Ms. Hammer's description of their contents. At most, Mr. Lesley's testimony can be read as a candid after-the-fact acknowledgment that he wished he had not relied on Ms. Hammer but had instead reviewed the electronic punch card data for himself, not as indicating that company policy before-the-fact promised a different or more thorough investigation. While the result of the investigation into Mr. Young's timekeeping practices may well have been wrong, and while that would be something to be regretted by all involved, Mr. Young has adduced no evidence in the record before us suggesting that he was entitled, as a matter of implied contract or promissory estoppel, to an investigation any more elaborate than the one he received.

\*\*\*

For the reasons discussed above, the district court's entry of summary judgment in favor of Dillon is **AFFIRMED**.