**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 8, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

KESHA LASHAWN MASTON,

        Plaintiff-Appellant,

v.

ST. JOHN HEALTH SYSTEM, INC.,

        Defendant-Appellee.

No. 08-5027
(D.C. No. 4:06-CV-00694-CVE-FHM)
(N.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **HARTZ**, **BALDOCK**, and **GORSUCH**, Circuit Judges.

---

Kesha Lashawn Maston appeals from the district court's order granting

summary judgment to her former employer, St. John Health System, Inc., on her

racial-discrimination complaint brought under Title VII of the Civil Rights Act of

1964, 42 U.S.C. §§ 2000e – 2000e-17, and 42 U.S.C. § 1981. Because

Ms. Maston failed to create a genuine issue of material fact concerning whether

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

St. John's reasons for firing her were pretextual, we affirm the grant of summary judgment.

## BACKGROUND

### 1. Ms. Maston's Employment with St. John

Ms. Maston is African-American. Regional Medical Laboratory (RML), a division of St. John, employed her from August 2001 until September 15, 2005. She began work for RML as a data-entry clerk. In 2002 she was transferred to RML's billing office, where Lorinda Wear became her supervisor. Wear remained her supervisor until St. John terminated her employment.

During the time Wear supervised Ms. Maston, she promoted her three times: to Client Specialist II, Client Specialist III, and to be a team leader for the Customer Service Team. Ms. Maston remained a team leader until her employment was terminated. She had a good working relationship with Wear, who gave her good performance reviews.

### 2. The ABC Incident

On September 12, 2005, Wear received a past-due statement from a mail-order company, ABC Distributing, LLC (ABC), for $304.27. RML had a business account with ABC. When Wear contacted ABC, she was told that orders had been faxed in to ABC from a "Felecia Vandiver" at RML.

"Felecia Vandiver" was not an RML employee. That name was an alias created by Djuana Welker, a white co-employee of Ms. Maston's. In the orders

-2-

she faxed to ABC, Welker gave RML's billing-office address as the shipping address and the billing-office email address as the email address for the orders. Using this system, Welker ordered Christmas gifts and had them delivered to herself, using the Felecia Vandiver name, at RML.

Wear determined that RML employees Georgia Bevenue and Destiny Taylor had signed for Federal Express packages from ABC. Bevenue and Taylor are white. On September 13, 2005, Wear spoke to James Withrow, RML's Director of Human Resources, about the ABC orders. He instructed her to contact security.

### 3. The Investigation

Tim Thomas, a security officer employed by St. John, began his investigation that same day. He interviewed and obtained statements from Ms. Maston, Bevenue, Taylor, and Welker.

In her statement Welker admitted that in the Fall of 2004 she went online and set up an account in the name of Felecia Vandiver. She ordered Christmas gifts online using the account. At one point she double-ordered items by mistake. She kept some of these items and her co-employees paid for others. In 2005 she established a second account in the name of Donna Brookover or Donna Overstreet. She set up this account so that she could order items on Taylor's behalf without risk to her credit if Taylor failed to pay.

Welker stated that she had not placed any orders using these accounts since her initial orders, for which she paid in full. She apologized for creating the accounts, and stated that she had "full intentions of providing any/all requested information I am able to provide to show all of this information is completely true." Aplt. App. at 135.

In her statement Taylor admitted that she had once gone to Welker to ask her to order items from ABC. Welker placed the order, and Taylor paid for the items with a money order. Taylor insisted that she had never personally opened an account with ABC under a false name, and did not find out about the use of a false name until after she placed the order with Welker. She did not have knowledge of any other personal orders from ABC.

Bevenue admitted in her statement that she had signed for a couple of packages that came into the office. She stated she did this at Ms. Maston's instructions. The only time she ever bought ABC items was when she purchased them from Welker, when Welker was selling Christmas items.

Ms. Maston stated that she had witnessed magazines, catalogs, and packages coming into the office for Felecia Vandiver. She signed for the packages and just put them in the usual place for packages and mail. She heard Welker say that if anything came in for "Felecia," such items would be hers. She saw Welker and Taylor pick up the packages.

## 4. Firings and Rehirings

As a result of the investigation, RML fired Welker, Taylor, Bevenue, and Ms. Maston. Welker and Taylor were fired on a Friday--September 16, 2005--for their involvement in the ABC matter.

The following Monday, Wear and Carol Ghere, director of RML, went to the human resources department to discuss reinstatement of Welker and Taylor. Wear and Ghere concluded that although the women used poor judgment in ordering items under a false name and in using RML as the guarantor, they did pay for the items they ordered, and were not involved in the order that resulted in the unpaid balance. Welker and Taylor were reinstated, under a number of specific conditions.

Ms. Maston was fired on September 15, 2005, for insubordination and for failure to cooperate in the investigation of the ABC orders. Wear prepared a termination statement that stated:

> On two different occasions of being questioned, [Ms. Maston] became insubordinate with Tim Thomas and myself. The first occasion she did state "Do I need to write this down, so I don't have to keep repeating myself?" The second time [she] stated "Do I need a lawyer, I don't have time for this shit."

> On 9-15-05 Carol [Ghere] and I called [Ms. Maston] at home and told her she was being terminated for insubordination and not cooperating during an investigation.

Aplt. App. at 140.

-5-

Bevenue was also fired for insubordination and/or failure to cooperate with the investigation. Neither Ms. Maston nor Bevenue was rehired.

## ANALYSIS

"This court reviews the district court's summary judgment decision *de novo*, viewing the evidence in the light most favorable to the non-moving party; in this case, in [Ms. Maston's] favor." *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 679-80 (10th Cir. 2007). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

"Where, as here, a Title VII plaintiff relies on indirect or circumstantial evidence to show discrimination, we examine the claim under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . .(1973)." *Young v. Dillon Cos.*, 468 F.3d 1243, 1249 (10th Cir. 2006). "Under *McDonnell Douglas*, the plaintiff carries the initial burden of establishing a prima facie case of racial discrimination. *See Kendrick* [*v. Penske Transp. Servs., Inc.*], 220 F.3d [1220,] 1226 [10th Cir. 2000] (discussing *McDonnell Douglas* [test])." *Id.* "Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for the adverse employment action." *Id.* "If the

defendant makes this showing, the burden then shifts back to the plaintiff to show that the defendant's proffered justification is pretextual." *Id.*

In response to Ms. Maston's uncontested prima facie case of discrimination, St. John supplied two related, nondiscriminatory reasons for firing her: her insubordination, and her failure to cooperate with the ABC investigation. The burden then shifted back to Ms. Maston to show that these reasons were pretextual.[1]

Ms. Maston makes two arguments to support her theory that St. John's reasons for firing her were a pretext for discrimination. She contends (1) that St. John's stated justification was unworthy of belief, and (2) that she is similarly situated to the white employees who were rehired.

## 1.  Credibility of St. John's Stated Justification for the Termination

### A.  Scope of Inquiry

We must first determine which incidents are relevant to the pretext inquiry. In Ms. Maston's termination statement, Wear specifically identified two comments that Ms. Maston made that justified her dismissal. But in seeking summary judgment, St. John presented broader evidence of Ms. Maston's

---

[1]     As a general matter it is the plaintiff's burden to show that each of the employer's reasons was pretextual. *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 814 (10th Cir. 2000).  When, however, the multiple grounds are closely intertwined and plaintiff shows that one of them is strongly suspicious, she may prevail. *Id.*

behavior. Thomas stated in his deposition, for example, that during the interviews about the ABC orders, Ms. Maston kept cursing and "kept saying she wouldn't answer my questions." Aplt. App. at 123. He also stated that he believed she was being evasive, although his opinion of Ms. Maston's conduct was of limited value, except to the extent adopted by Wear, because Wear, not Thomas, was the decision-maker. *See Kendrick*, 220 F.3d at 1231.

St. John's reliance on such additional incidents was permissible. First, there were no inconsistencies between the two comments specifically described in the termination statement and the behavior later cited in depositions and affidavits. Second, all the described incidents fit within the overall justification given for the termination—namely, insubordination and failure to cooperate with an investigation. *See Hardy v. S.F. Phosphates Ltd.*, 185 F.3d 1076, 1080-81 (10th Cir. 1999). We may thus go beyond the two specific comments set forth in the termination statement in determining whether St. John's reasons for termination were unworthy of belief.

### B. Alleged Deviation from the Handbook

Ms. Maston contends that her actions could not have constituted insubordination, because they do not fit the definition of insubordination contained in St. John's employee handbook. The handbook contains a nonexclusive list of "circumstances/behaviors [that] may result in immediate termination." Aplt. App. at 131. The term *insubordination* appears in one of the

-8-

listed items: "Willful refusal to follow direct orders (insubordination)." *Id.* at 132. Ms. Maston contends that her actions did not fit the handbook definition because she did not willfully refuse to follow a direct order. Therefore, she argues, RML's justification for her termination, that she was insubordinate, is unworthy of belief.

An employer's deviation from a binding company policy stated in an employee handbook can in certain circumstances be evidence of pretext. *See Kendrick*, 220 F.3d at 1230; *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1197 (10th Cir. 2008); *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007). Here, however, any inconsistency between the insubordination relied upon by Wear and the handbook "definition" is not evidence of pretext. The handbook definition is preceded by a caveat that "[t]he following list is a guideline and does not include all possible offenses." Aplt. App. at 131. Although the term *insubordination* on the itemized list in the handbook refers to a willful refusal to follow direct orders, St. John made no representation in the handbook that it does not also fire employees for other forms of insubordination. These could reasonably include being evasive during an interview, expressing defiance during an investigation, or swearing at an investigator. *See, e.g., McClellon v. Gage*, 770 S.W.2d 466, 469 (Mo. Ct. App. 1989) (listing "a defiant attitude" among recognized forms of insubordination). In short, the evidence

does not support a claim that St. John deviated from its policies in terminating Ms. Maston.

## C. Evidence of Insubordination and Failure to Cooperate

Thomas stated in his deposition that during the interviews about the ABC orders, Ms. Maston kept cursing and "kept saying she wouldn't answer my questions." Aplt. App. at 123. Ms. Maston disputes this. In an affidavit she stated that she wasn't uncooperative or evasive and that she continued to answer questions, even though she was asked the same questions over and over and was feeling harassed. But during her earlier deposition testimony she stated that at one point she had just stopped saying anything at all, because she was tired of answering the same questions over and over again. This silence at "one point," which is not inconsistent with her testimony that in general she continued to answer questions, fits St. John's contention that she did refuse to answer questions and thereby to cooperate with the investigation. Ms. Maston also admitted that she may have sworn once during the interviews. She presents no evidence to rebut St. John's contention that she was the only employee who swore during the investigation.

Ms. Maston contends, however, that her termination based on "failure to cooperate" was pretextual because Thomas expressed an equivocal opinion of her behavior. When asked during his deposition whether he felt she had been uncooperative during the interview, Thomas stated: "I don't know if she was or

not. I really don't know." Aplt. App. at 124. But Thomas was a security officer, not the decision-maker in Ms. Maston's case. It is the decision-maker's perception that counts in these circumstances. *See Kendrick*, 220 F.3d at 1231.

Ms. Maston also relies on the apologetic tone that Wear took after the interviews. She testified that Wear said, "I'm sorry he [Thomas] talked to you that way, and I know that wasn't right." Aplt. App. at 97.[2] We fail to see, however, how this apology supports Ms. Maston's claim. The apology was by the key person in Ms. Maston's termination. Wear was the supervisor present during Ms. Maston's interview. She was the one who wrote Ms. Maston's termination statement. And she was the one who sought reinstatement of two of Ms. Maston's coworkers but not reinstatement of Ms. Maston. The apology can only be viewed as an indication that Wear bore no personal hostility toward Ms. Maston. Indeed, Wear had promoted her three times, and Ms. Maston admitted that she had a good working relationship with Wear and that Wear had given her good performance reviews. In light of Wear's prior behavior toward Ms. Maston, we do not believe that a reasonable jury could infer that Wear's (and hence St. John's) explanation of Ms. Maston's termination was unworthy of belief.

---

[2] St. John contends that this testimony is inadmissible hearsay. We do not agree. The statement is a nonhearsay admission by a party opponent. *See Thomas v. Int'l Bus. Mach.*, 48 F.3d 478, 485 (10th Cir. 1995) ("If [Ms. Maston] is testifying to what an authorized agent for [St. John] told her, the statements would constitute an admission by a party-opponent and therefore be admissible under Fed. R. Evid. 801(d)(2)").

**2. Did RML Treat "Similarly Situated" Employees Differently?**

In her other pretext argument, Ms. Maston contends that she was similarly situated to white RML employees in her department, who were rehired, while she was not. "[A] plaintiff may show pretext by providing evidence that [s]he was treated differently from other similarly situated, nonprotected employees who violated work rules of comparable seriousness." *Green v. New Mexico*, 420 F.3d 1189, 1194 (10th Cir. 2005) (internal quotation marks omitted). RML concedes that Ms. Maston was similarly situated to Taylor and Welker. The remaining issue is whether she demonstrated a genuine factual dispute concerning her violation of a work rule of comparable seriousness.

Ms. Maston contends that the offenses committed by Taylor and Welker were of comparable seriousness to hers because the employee handbook identifies the following offense that could result in immediate termination: "falsification of records or reports dealing with St. John business." Aplt. App. at 132. She argues that because she was also fired for grounds contained in the handbook, the firings were for offenses of comparable seriousness. But as RML points out, nowhere in the termination statements for Taylor and Welker is this ground mentioned as the reason for discharging them. Nor is it clear that Ms. Maston was discharged based on a comparable offense listed in the handbook. Moreover, the handbook does not specify the conditions under which employees may be reinstated after termination.

The evidence shows that Taylor and Welker cooperated in the investigation, admitting their participation in the ABC scheme. An employer is entitled to consider a candid admission of guilt when weighing how severely to discipline an employee. There is no evidence that Ms. Maston attempted to apologize for her conduct.

Ms. Maston also argues that Georgia Bevenue, the other employee fired but not rehired, was not similarly situated to herself. Even if this is true, it has little relevance to the pretext question. Although a showing that RML retained a similarly situated white employee who committed the same misconduct might tend to establish pretext, it is of much less relevance that RML happened to fire a white employee. That the fired white employee's misconduct was worse than Ms. Maston's would hardly show that Ms. Maston's misconduct did not justify firing.

In sum, Ms. Maston has failed to show a genuine factual issue regarding whether Welker or Taylor violated work rules of comparable seriousness. For this reason, the district court properly concluded that she failed to show pretext by demonstrating that a similarly situated white employee was treated differently than she was.

## CONCLUSION

Ms. Maston failed to create a genuine issue of material fact concerning whether St. John's reasons for firing (and not rehiring) her were pretextual. We

therefore AFFIRM the judgment of the district court granting summary judgment in favor of St. John.

Entered for the Court


Harris L Hartz
Circuit Judge