FILED
United States Court of Appeals
Tenth Circuit

December 17, 2019

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

EMORI DODSON,

    Plaintiff - Appellant,

v.

FLYING DOVE, INC., d/b/a IHOP #2045,

    Defendant - Appellee.

No. 19-3091
(D.C. No. 5:18-CV-04034-SAC)
(D. Kan.)

_____

**ORDER AND JUDGMENT***
_____

Before **PHILLIPS**, **McHUGH**, and **EID**, Circuit Judges.
_____

Emori Dodson appeals the district court's grant of summary judgment in favor

of Flying Dove, Inc., on her Title VII employment-discrimination claims. Exercising

jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

**I.**    **Factual Background**

Dodson was employed as a part-time server at an International House of

Pancakes restaurant operated by Flying Dove, Inc. (hereafter, IHOP). She worked for

---

* After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

IHOP off and on beginning in July 2015. Her employment-discrimination claims relate to her last period of employment, which started in July 2017.

Dodson's manager was Adham Saleh. His brother-in-law, Abass Fares, also worked at IHOP as a full-time cook. Dodson is white and Christian. Saleh and Fares are Arab and Muslim. Dodson and Fares began a romantic relationship in August 2017, and she learned she was pregnant in September.

The record in this case includes over 60 pages of text messages between Dodson and Saleh. These text messages provide the bulk of the evidence supporting IHOP's reasons for changing Dodson's work schedule and later terminating her employment.[1]

According to Saleh, "Dodson was a major cause of workplace stress for other employees." Aplt. App., Vol. 2 at 60. Dodson made her relationship with Fares public knowledge at IHOP, despite Saleh's repeated warnings, in person and through text messages, to keep her personal-life drama out of the workplace. Her fellow IHOP employees, and Dodson herself, frequently referred to Dodson as being "crazy" or "psycho." Dodson was also late for her shift on four days in August 2017.

Over the course of her final period of work at IHOP, Saleh observed that "Dodson's behavior became progressively more erratic and concerning." *Id*. On August 28, Fares was a passenger in Dodson's car when she was arrested for drunk driving and drug possession. Saleh "became increasingly worried about how

---

[1] We generally quote these messages without attempting to correct spelling, punctuation, or grammar.

Dodson's illicit drug activity was affecting her work as well as [his] home life." *Id.* On the night of September 12-13, sometime between 11:00 p.m. and 2:00 a.m., Dodson banged on the door of Saleh's home. Saleh answered and observed that Dodson appeared to be intoxicated. She was crying and screaming for Fares, who was inside Saleh's house. A neighbor called the police to report a disturbance, but Dodson left before the police arrived. Saleh decided to fire Dodson after this incident. But he ultimately changed his mind due to her social relationship with Fares as well as her relationship with Saleh and his wife, and his concern about Dodson's instability and how it would affect his home life if he did not allow her to return to work at IHOP.

Although Saleh continued to tell Dodson that he did not want to be involved in her relationship with Fares, she persisted in texting him about it. By way of example, Dodson texted Saleh on September 7 complaining about Fares. Saleh responded, "Text [Fares]. I am working right now . you guys need to figure things out . I can't be in between your relationship." *Id.* at 141. When Dodson persisted with additional texts, Saleh texted back, "really I'm sorry I can't be involved that much between bot[h] of u." *Id.* In the next 15 minutes, Dodson sent Saleh ten more texts complaining about Fares. On September 23, Dodson texted Saleh a photo of a positive pregnancy test. Saleh responded, "it's your own personal life so please try to figure something out of IHOP cause its not good to show our life outside the work inside the work and wish the best for both of you." *Id.* at 151.

3

Text messages between Dodson and Saleh over the next two weeks indicate that Dodson was late for a shift, asked for a shift to be rescheduled, left a shift early, and missed a shift. Saleh confronted Dodson about her tardiness, absenteeism, habitual disregard of the work schedule, and fighting with Fares at work. Saleh's practice was to use written warnings infrequently. But at his night manager's urging, he issued a written warning to Dodson on October 13, stating, "No call No show No job. Not the first time, not following directions as she should be, also not the first time." *Id.* at 197. Saleh warned Dodson that failure to take corrective action would result in her termination.

Within a day after Dodson received the written warning, she and Fares fought at work and threw things at each other.[2] Saleh decided that he could no longer schedule Dodson and Fares during the same shifts. He chose to continue scheduling Fares on evening shifts because IHOP was constantly short of cooks, Fares frequently worked more than 40 hours a week, and it would be necessary to hire one or two additional people to cover his evening shifts. In contrast, Saleh could easily cover Dodson's evening shifts with other servers. In addition, Saleh chose to change Dodson's shifts because he believed that she was primarily responsible for the fighting, Fares was a more reliable employee than Dodson, and Fares was his brother-in-law.

---

[2] Dodson asserts that "Fares was the one throwing things at [her]," Aplt. Br. at 14, but she does not specifically deny throwing something at Fares on this occasion, as documented in a text message she sent to Saleh, *see* Aplt. App., Vol. 2 at 161.

4

Because Dodson was not able to work day shifts during the week, Saleh scheduled her to work weekend day shifts. Dodson responded to her schedule change with a barrage of texts to Saleh, some using profanity. She questioned Saleh's decision and demanded to continue working night shifts because she could make more money in tips. She suggested that Saleh's decision was related to her "race, religion, culture, or the fact [she was] pregnant." *Id.* at 161. Saleh did not respond.

During the next several days, Dodson texted Saleh complaining about Fares. When she noted his lack of response, Saleh texted, "I don't want to be involve with all this . . . and please don't text me back or I'll call the cops." *Id*. at 162. At this point he told Dodson she could only text him regarding her job.

On October 25, Dodson filed a complaint with the Equal Employment Opportunity Commission alleging IHOP had discriminated against her based on her race, sex, religion, and pregnancy. She alleged adverse actions including her reduced work hours, Saleh's written warning, and IHOP's failure to stop Fares from throwing things at her at work.

In early November, Saleh declined Dodson's texted requests to change her upcoming weekend shift and schedule her on evening shifts at IHOP to accommodate her work schedule at another restaurant. In response to Saleh's decision, Dodson texted: "It's not my fault u hire any trash that walks through that door." *Id.* at 165. Saleh texted back: "Don't text or call me again , cause I don't like the way how u talk so if you need anything u can call only the store." *Id.*

5

On November 29, Dodson texted Saleh at 11:31 p.m., stating "I'm knocking on ur door one more time." *Id.* at 168. She texted him again after midnight. According to Saleh, Dodson had been banging on the door of his residence again, although Dodson denies that she was there. The next morning she texted Saleh, once again complaining about Fares. Saleh responded, "Thank you for working with me but you're not allowed to work with me anymore it's enough Good luck with your adventure. . . . You're fired." *Id.* Dodson then sent Saleh the following stream of texts over the next 20 minutes:

> Why am I firedd . . . Is it retaliation . . . Bc it's very unprofessional to fire me through a text . . . And I will take IHOP with me . . . Good luck to you actually . . . I was planning on keeping the peace for [Fares's] sake but I'm over it . . . Is this something u and [Fares] decided last night . . . So since ur not my boss anymore I can text u forever right lol . . . Oh good . . . Ur going to enjoy me a lot better as an employee than not . . . I will make sure of that . . . And when I say I'm taking it down w me I mean it. Good luck. Uve already ruined that store enough. U know what u and a cockroach have in common? . . . You're both a disgusting waste of life. Enjoy the ride.

*Id.* at 168-69.

That same day, Saleh contacted the police. He reported that Dodson "ha[d] been calling and texting him continuously, and going by his residence and beating on the door and yelling." *Id.* at 291. Saleh indicated that he had fired Dodson and had asked Fares to leave his house so Dodson would leave him alone. A police officer spoke to Dodson, who "admitted she was going to Saleh's residence and calling and texting him due to her trying to get ahold of Fares, who is the father of her child." *Id.* The officer "[i]nformed Dodson that she [was] no longer allowed to have contact with Saleh in person or via telephone, she [was] not allowed to go to his residence

6

. . . , and she [was] not allowed on the property at Ihop.  Dodson stated she understood and would discontinue her actions."  *Id.*

## II.     Procedural Background

Dodson sued IHOP alleging discrimination based on her pregnancy, race, sex, and religion.  IHOP moved for summary judgment on all claims.

### A.     Direct Evidence of Discrimination

Dodson first contended she had direct evidence of pregnancy discrimination based on her observation of Saleh's general displeasure with her becoming pregnant with Fares's baby and Saleh's comments to her and to a co-worker "on several occasions that [she] should 'get rid of the baby.'"  *Id.*, Vol. 3 at 30.  Applying the standard that "[d]irect evidence demonstrates on its face that the employment decision was reached for discriminatory reasons," the district court also noted "the importance of context and temporal proximity in determining whether comments reflecting personal bias qualify as direct evidence of discrimination."  *Id.* at 108, 111 (internal quotation marks omitted).  The court concluded that Dodson's cited evidence was circumstantial rather than direct, stating, "Without a context for Saleh's comments and without a basis for directly linking Saleh's comments and attitude to an employment decision, there is no direct evidence that demonstrates on its face that the employment decision was reached for discriminatory reasons."  *Id.* at 112 (internal quotation marks omitted).

## B.   *McDonnell-Douglas* Analysis

Lacking direct evidence of discrimination, the district court therefore considered all of Dodson's claims under the *McDonnell-Douglas* burden-shifting framework. *See Young v. Dillon Cos.*, 468 F.3d 1243, 1249 (10th Cir. 2006). It first held that she failed to make out a prima facie case of discrimination based on her race or religion. The court then assumed without deciding that she had satisfied her prima facie burden as to her pregnancy- and sex-discrimination claims.

Dodson conceded that IHOP had met its burden to articulate legitimate, non-discriminatory reasons for changing her work schedule and terminating her employment. The district court summarized IHOP's reasons, the first of which was Dodson's behavior toward Saleh, which was "harassing, stalking, disturbing and menacing, and had become more threatening to [Saleh's] personal life and home." Aplt. App., Vol. 3 at 119. Saleh had "severed all ties with Dodson, terminated her employment, and involved the police in enforcing his decision." *Id.* The district court held that the text messages in the record "overwhelmingly evidence Saleh's primary reason for his adverse employment actions." *Id.* at 121.

IHOP's second reason was Dodson's frequently missed work shifts and late arrivals. Its third reason was her violation of IHOP policies on fighting, drugs, intimidation, insubordination, disrespectful conduct, and holding outside employment having an adverse impact on her IHOP job. In particular, Dodson brought the drama of her romance with Fares into the workplace, and she sent disrespectful, demanding, and sometimes profane text messages to Saleh, her manager. The district court held

8

that Dodson did not effectively controvert the text-message evidence regarding her workplace conduct or her attendance and attitude issues.

The burden then fell to Dodson to show that IHOP's proffered reasons were pretext: "that the employer's explanation was so weak, implausible, inconsistent or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination." *Young*, 468 F.3d at 1250. The district court held that, although Dodson's evidence of male favoritism at IHOP was relevant, it failed to show pretext because she did not connect that evidence to Saleh's decisions. "Instead, the text messages confirm Saleh's reasons for his decisions to be transparent and developing consistent with Dodson's increasingly difficult behavior." Aplt. App., Vol. 3 at 125.

The court held that Saleh's comment to a co-worker that Dodson was a "crazy bitch" also did not create a genuine issue of pretext. It reasoned that, when placed in context, the comment reflected Saleh's exasperation with Dodson's behavior, which the court found was largely established in the text messages between Saleh and Dodson and uncontroverted. The court also noted that "[t]he only references in the[] text messages to Dodson's race, religion, sex, or pregnancy come from Dodson trying to make them an issue." *Id.* at 122.

The district court also rejected Dodson's contention that pretext could be found based on her receipt of a single written warning shortly after Saleh learned she was pregnant. It held that temporal proximity alone is insufficient to show pretext, and that Dodson lacked other evidence to sustain such an inference. In particular, it

9

was undisputed that Saleh rarely gave written warnings and did so here at the request of his night manager. Moreover, the substance of the written warning was consistent with Dodson's behavior as reflected in the text messages.[3]

The district court held that, based on the evidence of record, a reasonable factfinder could not rationally find that Saleh's reasons for changing Dodson's work schedule and terminating her employment are not worthy of credence and that he instead acted based upon the alleged discriminatory reasons. Accordingly, the district court granted summary judgment in favor of IHOP.

## III.    Discussion

"We review the district court's grant of summary judgment de novo." *Young*, 468 F.3d at 1249. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In conducting our analysis, we view all of the facts in the light most favorable to the non-movant and draw all reasonable inferences from the record in favor of the non-moving party." *Young*, 468 F.3d at 1249.

Dodson first argues that she presented direct evidence of pregnancy discrimination. "Direct evidence demonstrates on its face that the employment

[3] The district court also ruled against Dodson on two evidentiary issues. Sustaining IHOP's objection, the district court excluded Dodson's affidavits purporting to show that her attendance issues were no worse than other IHOP employees. It held that the affidavits were not based on personal knowledge and therefore lacked foundation. The court also overruled Dodson's relevance objection regarding the evidence of her drunk-driving arrest.

10

decision was reached for discriminatory reasons. Circumstantial evidence allows the jury to draw a reasonable inference that discrimination occurred." *Danville v. Reg'l Lab. Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002) (citation omitted). Moreover, "discriminatory statements do not qualify as direct evidence if the context or timing of the statements is not closely linked to the adverse decision." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013). Accordingly, "stray remarks in the workplace" are insufficient to constitute direct evidence. *Id.* at 1217 (internal quotation marks omitted).

Dodson points to comments by Saleh that she should "get rid" of the baby or that it would be better for his family if she did so.[4] She asserts that these comments demonstrate discriminatory animus, but she specifically argues that Saleh's animus was toward her *religion*. *See* Aplt. Br. at 13 ("Clearly, Saleh was displeased that his brother-in-law had fathered a child with a non-Muslim, Christian woman and considered it an embarrassment or a problem for his family."). Saleh's comments are not direct evidence of religious discrimination because they do not reflect anti-Christian animus "on [their] face." *Danville*, 292 F. 3d at 1249.

Dodson also argues that Saleh's comments are direct evidence of pregnancy discrimination because they were more than stray remarks. But the district court held that her evidence lacked the necessary context to demonstrate on its face that IHOP made employment decisions for a discriminatory reason. *See Tabor*, 703 F.3d at

---

[4] Dodson provides appendix citations for this evidence but the page numbers cited do not exist in the Appellant's Appendix that she provided to the court.

11

1216.  She fails to show error in that holding by pointing to evidence that any of

Saleh's comments were closely linked to an adverse employment decision.  *See id.*

Turning to the *McDonnell-Douglas* analysis, we assume for purposes of

Dodson's appeal that she satisfied her burden to demonstrate a prima facie case as to

all of her claims.  Because she does not dispute that IHOP met its burden to articulate

legitimate, non-discriminatory reasons for changing her work schedule and

terminating her employment, she must show error in the district court's holding that

she failed to come forward with evidence demonstrating pretext.

After setting forth applicable law, Dodson's argument of error consists of three

paragraphs in which she lists evidence that, as noted above, the district court found

insufficient to raise an inference of pretext.  She provides no citations to the record

supporting her evidentiary assertions.[5]  And she makes no effort to demonstrate error

in the district court's rationale.  Nor does she offer her own analysis why the

evidence shows that any of IHOP's reasons was "so weak, implausible, inconsistent

or incoherent that a reasonable fact finder could conclude that it was not an honestly

held belief but rather was subterfuge for discrimination."  *Young*, 468 F.3d at 1250.

Dodson instead simply asserts, without meaningful elaboration, that "nearly all of the

relevant evidence in support of IHOP's motion is controverted," Aplt. Br. at 21, and

"there [are] clearly questions of material fact that remain to be resolved," *id.* at 22.

---

[5] The few appendix pages that Dodson cites in this section of her appeal brief
are once again not contained in the Appellant's Appendix that she provided to the
court.  We will not hazard to guess what evidence she intended to cite.

Dodson's perfunctory contentions are insufficient to invoke this court's review. *See Murrell v. Shalala*, 43 F.3d 1388, 1390 n.2 (10th Cir. 1994) (reiterating the "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" (internal quotation marks omitted)). And we decline to construct a pretext argument for her. *See Perry v. Woodward*, 199 F.3d 1126, 1141 n.13 (10th Cir. 1999) (stating the court "will not craft a party's arguments for him" and declining to address an argument "not adequately developed"); *see also* Fed. R. App. P. 28(a)(8)(A) (requiring an appellant's argument to include her "contentions and the reasons for them, with citations to the authorities and parts of the record on which appellant relies").

## IV.  Conclusion

We have reviewed the district court's summary judgment order and the parties' appeal briefs, and we conclude that Dodson has not demonstrated any reversible error in the district court's grant of summary judgment in favor of IHOP. The judgment of the district court is therefore affirmed.

Entered for the Court

Gregory A. Phillips
Circuit Judge

13